UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MARCUS ALSTON et al.,

                    Plaintiffs,

v.

CITY OF DETROIT POLICE
OFFICERS et al.,

                    Defendants.

Case No. 21-11944
Honorable Shalina D. Kumar
Magistrate Judge Kimberly G. Altman

---

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (ECF NO. 43)**

---

## I.    Introduction

Plaintiffs Marcus Alston, Antjuan Hardy, Antonieo Hardy, and Lester

Jones sue defendants the City of Detroit (the City) and its police officers

Kairy Roberts, Christopher Dodd, Scott Barrick, Terrance Barmore,

Garnette Steen (collectively the Officers), for injuries following a scuffle in

Greektown, a neighborhood in Detroit, Michigan.[1] ECF No. 32. For the

Officers' actions after that scuffle, plaintiffs allege tort claims under state

law and federal constitutional claims under 42 U.S.C. § 1983. *Id.*

---

[1] Plaintiffs also bring a claim against officer Sederick Dunbar. ECF No. 32.
But because they abandon their claim against Dunbar, the Court dismisses
Dunbar from this action.

Defendants move for summary judgment on several of plaintiffs' claims. ECF No. 43.[2] The motion has been briefed, ECF Nos. 43, 46-47,[3] and does not require a hearing for the Court to decide it. *See* E.D. Mich. LR 7.1(f)(2). For the reasons below, the Court grants in part and denies in part defendants' motion.

## II.    Background

### A. Facts

#### i.    Facts Relevant to All Plaintiffs

On August 1, 2021, plaintiffs, a group of friends, met in Detroit to celebrate Jones' upcoming wedding. ECF No. 43-4, PageID.750. Their

---

[2] Defendants filed two motions for summary judgment. ECF Nos. 42, 43.They neglected to attach their intended exhibits to the initial motion. ECF No. 42. They then filed an identical motion—this time with their missing exhibits. ECF No. 43. Accordingly, the Court terminates the earlier filed motion and refers to the later filed motion.

[3] Defendants filed their reply brief one day late. ECF No. 47. Only seventeen days later and after plaintiffs asked that the reply brief be stricken due to delay did defendants move to extend time to file their reply brief. ECF Nos. 48-49. In their motion to extend time, defendants explain that their delay was due to "internal error[s] in calculating and calendaring." ECF No. 49. Defendants quote Federal Rule of Procedure 6(b)(1)(B) to state that "the Court may permit late filings 'on motion made after the time has expired . . . ,'" conveniently omitting the rest of the Rule's sentence ("if the party failed to act because of excusable neglect") and failing to argue excusable neglect. But because the reply brief provides some needed supplementation for defendants' motion for summary judgment and plaintiffs point to no prejudice from the one-day-late reply brief, the Court **GRANTS** defendants' motion to extend time. ECF No. 49.

celebration led them to enjoying a night in Greektown, a business and entertainment district in Detroit that tends to attract large crowds. *Id.* at PageID.751; ECF No. 43-6, PageID.839. In Greektown, plaintiffs encountered the City's police officers. ECF No. 43-1, PageID.664.

Many officers were present in Greektown as part of the City's strategy to deal with large crowds and keep the peace—having many "more officers deter people . . . and keep the peace as opposed to [things] getting out of control." ECF No. 46-3, PageID.1262. The City's strategy leveraged the specialized crowd control training it provided to officers who were mounted on horses. ECF No. 43-13, PageID.1117. Although the City did not provide formal or official training for non-mounted officers to control large crowds, those officers generally receive hands-on crowd control training from "actually deal[ing] with [crowds]," like the ones in Greektown on the night of August 1, 2021. ECF No. 43-9, PageID.889-90. The City's crowd control that night involved Barrick supervising his subordinate officers as they escorted a group of young men out of Greektown. ECF No. 43-6, PageID.838, 847.

After plaintiffs encountered the escort supervised by Barrick and officers instructed them to leave Greektown, plaintiffs turned around and followed a crowd and the escort to leave the area. ECF No. 43-1,

PageID.664; ECF No. 43-2, PageID.706, 720. As they did so, they noticed right behind them a commotion between several officers and a group of young men. ECF No. 43-2, PageID.705; ECF No. 43-5, PageID.801. The officers and the young men clashed, resulting in a physical altercation. ECF Nos. 43-7, 46-5. The altercation expanded in scope and came to involve plaintiffs, starting with Antonieo. ECF No. 43-6, PageID.847; ECF No. 43-2, PageID.705.

### ii.   Facts Relevant to Antonieo

Antonieo lagged behind the other plaintiffs and commented on what he believed to be the officers excessively beating the group of young men. ECF No. 43-2, PageID.705 ("So I say look, look, they [the officers] on something . . . . I said oh, ya'll doing to [sic] much."). Antonieo spoke out against the officers loudly, and others started calling attention to the fight. *Id.* at PageID.705, 715.

As plaintiffs walked along with the crowd, including certain defendants and other officers, Steen rode his horse in front of plaintiffs, and the crowd surrounding plaintiffs suddenly became agitated. ECF No. 46-6, 01:55-02:10; ECF No. 46-7, 00:23-00:29. According to plaintiffs, after Antonieo finished criticizing the officers for fighting the young men, an older officer pushed Antonieo. ECF No. 43-2, PageID.705, 715; ECF No. 43-4,

PageID.752. Roberts then "came out of nowhere" and punched Antonieo in

his nose, causing him to fall onto the sidewalk. ECF No. 43-2, PageID.705,

709. According to defendants, however, Roberts punched Antonieo after he

had "observed [Antonieo] holding onto an object, possibly a bottle

containing liquid, [and] strike [an] officer in his head area with it." ECF No.

43-9, PageID.933. Officers then handcuffed Antonieo and gave him a

ticket. ECF No. 43-2, PageID.707.

### iii.   Facts Relevant to Antjuan

As Antjuan proceeded along with the crowd, he did not say anything

to any officers. ECF No. 43-5, PageID.802. Seconds after Steen rode in

front of plaintiffs, he felt somebody punch him and lost consciousness. ECF

No. 43-5, PageID.801; *see* ECF No. 46-6, 02:05-02:10., Several officers

pushed Antjuan, while unconscious, into Barmore, who put Antjuan into a

chokehold, took him down onto the pavement, and punched him several

times. ECF No. 43-5, PageID.801, 803; ECF No. 43-1, PageID.665; ECF

No. 46-6, 02:15-02:25.

While Barmore punched Antjuan on his head and back, three other

officers piled onto him, and still other officers surrounded him. ECF No. 43-

5, PageID.801; ECF No. 46-6, 02:15-02:25. According to Alston, Antjuan

was not moving while the officers were using force against him. ECF No.

43-1, PageID.665. As Antjuan regained consciousness, he was on his chest with Barmore punching him and officers directing him to put his hands behind his back. ECF No. 43-5, PageID.803. The officers then arrested him and gave him a ticket. *Id.*

### iv.   Facts Relevant to Alston

While Antonieo and Antjuan were being forced onto the sidewalk, officers also pushed Alston forward along the sidewalk. ECF No. 43-1, PageID.666. Alston walked onto the street and, with open hands, approached Dodd for information. *Id.* Dodd was "not doing nothing, just standing there," and according to Alston, Dodd listened to Alston until Dodd heard Alston ask for badge numbers, at which point Dodd told Alston to back away. *Id.* at PageID.666, 668. Alston stopped in front of Dodd a couple feet away and continued to ask for badge numbers. ECF No. 46-9. According to Alston, he asked for badge numbers while having his hands up to show that he was not a threat. ECF No. 43-1, PageID.666, 668. Dodd's bodycam footage shows that Alston did not keep his hands up but was instead motioning with open hands while asking for badge numbers. ECF No. 46-9.

After Alston repeatedly asked for badge numbers, Dodd approached Alston and grabbed him by his shirt. *Id.* While holding onto Alston's shirt,

Dodd pushed Alston back at least ten feet. *Id.* As Dodd was pushing

Alston, Barrick and a group of officers close to Dodd and Alston started

moving towards them. ECF No. 46-11, 01:50-2:05. Dodd then threw Alston

at least another ten feet, causing Alston to fall onto the street. *Id.* Alston

then stood up, pointed at Dodd, and continued to ask for badge numbers.

*Id.*; ECF No. 43-1, PageID.666. Roberts then punched Alston, briefly

knocking him out and causing Alston's head to hit the pavement. ECF No.

46-9.

Roberts then propped Alston up on his legs, "made sure [Alston] was

responsive and conscious," and assessed the extent of Alston's injuries.

ECF No. 43-9, PageID.957-58. According to Roberts, Alston had a minor

cut to his mouth but did not suffer any physical injuries that needed

immediate medical attention. *Id.* After seeing that Alston was responsive

and "appeared to be okay," Roberts, Dodd, and all other officers walked

away from Alston while he was on the street. *Id.* at PageID.958; ECF No.

43-1, PageID.667. No officer approached Alston about medical attention,

and Alston was not arrested or given a ticket. ECF No. 43-1, PageID.667.

### v.   **Facts Relevant to Jones**

While Dodd was pushing Alston back, Jones remained on the

sidewalk, held his hands up, and asked for badge numbers. ECF No. 43-4,

PageID.754. Once Jones saw Roberts punch Alston, he started making his

way over to Alston. *Id.* But Steen then herded Jones with his horse towards

an "area where [Steen] wanted [Jones] to be." *Id.* at PageID.754-55. Jones

waited in that area until it became calm—he was not arrested or given a

ticket. *Id.* at PageID.755.

## B. Procedural Background

Plaintiffs filed this action on August 20, 2021 and subsequently filed

an amended complaint. ECF Nos. 1, 32. Plaintiffs allege the following

claims: under § 1983, Fourth Amendment unreasonable search and

seizure against the Officers (Count I), Fourth Amendment excessive force

against the Officers (Count I), First Amendment retaliation against the

Officers (Count I), municipal liability against the City (Count II), failure to

intervene against the Officers (Count III), failure to provide medical care

against the Officers (Count IV), and supervisory liability against Barrick and

Dunbar (Count V); under M.C.L. § 691.1407, gross negligence by the

Officers (Count VI); and under state common law, assault and battery by

the Officers (Count VII). ECF No. 32.

Defendants filed a motion for summary judgment, seeking summary

judgment on all claims. In response, plaintiffs conceded their § 1983 claims

for Fourth Amendment unreasonable search and seizure (Count I) and

failure to intervene (Count III), and their state law claims for gross negligence (Count VI) and assault and battery (Count VII). The Court therefore dismisses these claims. For the remaining claims, although defendants invoke both Federal Rule of Civil Procedure 12(b)(6) and 56, they provide no arguments based on the contents of the complaint, as required for dismissal of claims under Rule 12(b)(6). But as required for summary judgment under Rule 56, they base their arguments on materials produced in discovery, which the parties have fully completed. Accordingly, the Court reviews defendants' motion as to the remaining claims under the summary judgment standard.

## III.    Standard of Review

Summary judgment is appropriate where the evidence in the record, viewed in its entirety, shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(a). A party asserting either that "a fact cannot be or is genuinely disputed must support the assertion" by "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute." Fed. R. Civ. Pro. 56(c)(1).

In reviewing a motion for summary judgment, the court must "view the factual evidence and draw all reasonable inferences in favor of the non-moving party." *Williams v. Mauer*, 9 F.4th 416, 430 (6th Cir. 2021) (citation omitted). Further, the court may not "weigh the evidence and determine the truth of the matter" at the summary judgment stage. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The ultimate question for the court to determine "is whether the evidence presents a sufficient factual disagreement to require submission of the case to the jury, or whether the evidence is so one-sided that the moving parties should prevail as a matter of law." *Payne v. Novartis Pham. Corp.*, 767 F.3d 526, 530 (6th Cir. 2014) (citing *Anderson*, 477 U.S. at 255).

The moving party bears the initial burden of "informing the district court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts." *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009) (citation omitted); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 331 (1986) ("If the burden of persuasion at trial would be on the *nonmoving party*, the party moving for summary judgment may satisfy Rule 56's burden of production in either of two ways. First, the moving party may submit affirmative evidence that negates an essential element of the nonmoving

party's claim. Second, *the moving party may demonstrate to the Court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim*." (Brennan, J., dissenting) (second emphasis added) (internal citations omitted)).

If the moving party carries its burden, the non-moving party "must come forward with specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 322-23. A non-moving party has not made that sort of showing if "the record taken as a whole could not lead a rational trier of fact to find" in the party's favor. *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) (citation omitted).

The court is not required to "search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989). Indeed, "it is not for the court to search the record and construct arguments. Parties must do that for themselves.*" Brenay v. Schartow*, 709 F. App'x 331, 337 (6th Cir. 2017) (declining to consider party's arguments when it left "it to the court to seek out the relevant law, identify the relevant evidence, and develop their argument for them"); *see also, e.g.*, *Lyngaas v. Curaden* AG, No. 17-10910, 2021 WL 6049428, at *3 (E.D. Mich. Dec. 21, 2021) ("Where a party fails to explain an argument and supply authority . . . a court need not

attempt to supply the missing information."). Accordingly, "[i]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived"—"[i]t is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to put flesh on its bones." *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) (quotations and alterations omitted).

## IV. Analysis

### A. Preliminary Matters

For the sake of clarity in the following analysis, the Court must address a few preliminary matters. First, plaintiffs' remaining claims are all § 1983 claims for Fourth Amendment excessive force (Count I), First Amendment retaliation (Count I), municipal liability (Count II), supervisory liability (Count V), and failure to provide medical care (Count IV).

Second, for each remaining claim except that for municipal liability, defendants assert qualified immunity. "Qualified immunity is an affirmative defense that protects government officials from liability 'when a reasonable official in the defendant's position would not have understood his or her actions to violate a person's constitutional rights.'" *Webb v. United States*, 789 F.3d 647, 659 (6th Cir. 2015) (quoting *Meals v. City of Memphis*, 493 F.3d 720, 729 (6th Cir. 2007)). Officers are entitled to qualified immunity

"unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'" *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)).

But defendants only attack the factual bases of the alleged constitutional violations. They develop no argument as to the "clearly established" prong of the qualified immunity analysis. In the Sixth Circuit, plaintiffs bear the burden of showing that officers are not entitled to qualified immunity. *See LeFever v. Ferguson*, 645 F. App'x 438, 442 (6th Cir. 2016). Even so, defendants seeking summary judgment bear the initial burden of "informing the district court of the basis for its motion." *Alexander*, 576 F.3d at 558; *see also Celotex*, 477 U.S. at 331. That burden requires defendants to provide record citations or "*show*[] that the materials cited do not establish the absence or presence of a genuine dispute." Fed. R. Civ. Pro. 56(c)(1) (emphasis added). Further, "[i]ssues adverted to in a perfunctory manner," without developed argumentation, are waived. *McPherson*, 125 F.3d at 995. Because defendants offer no argument as to whether the rights at issue were clearly established, they waive such arguments. *See id.*; *Evans v. Vinson*, 427 F. App'x 437, 447 (6th Cir. 2011) (holding defendants waived arguments as to "clearly established" prong

where defendants' qualified immunity argument was a "one-and-a-half

page statement of the law with no attempt at argument, and . . . cit[ation]

[to] only the first prong of the test").

Third, although the parties focus on whether defendants violated

plaintiffs' constitutional rights, they fail to appropriately parse each claim,

plaintiff-by-plaintiff, defendant-by-defendant. Although that failure starts

with the complaint, which mainly alleges throughout that the Officers as a

group violated plaintiffs' rights as a group, ECF No. 32, defendants' motion

for summary judgment suffers from the same imprecision. The motion

contains mostly one-paragraph arguments, largely devoid of legal and

record citations, for each claim. *See, e.g.*, ECF No. 43, PageID.643

(excessive force), 644 (retaliation), 652 (failure to provide medical care).

Those one-paragraph, citation-lacking arguments purport to carry

defendants' initial burden of demonstrating the absence of fact issues as to

each plaintiff's claim against each Officer separately. In many instances,

they do not.

Despite the parties' general imprecision, the Court must consider

each plaintiff's claims against each defendant separately. *See Smith v. City

of Troy*, 874 F.3d 938, 944 (6th Cir. 2017) ("When more than one officer is

involved, the court must consider each officer's entitlement to qualified

immunity separately. [And] the court must segment the incident into its constituent parts and consider the officer's entitlement to qualified immunity at each step along the way." (citing *Morrison v. Bd. of Trs. of Green Twp.*, 583 F.3d 394, 401 (6th Cir. 2009))); *cf. Armstrong v. Whirlpool Corp.*, 363 F. App'x. 317, 324-29 (6th Cir. 2010) (considering each plaintiff's claims separately based on the experiences of each particular plaintiff). However, the Court neither conducts its own search for relevant evidence or legal authorities nor creates and develops substantial arguments for either party. *See Street*, 886 F.2d at 1479-80; *Brenay*, 709 F. App'x at 337. As indicated below, where defendants fail to carry their initial burden on summary judgment, they waive their arguments. *See Alexander*, 576 F.3d at 558; *McPherson*, 125 F.3d at 995-96. The defendants are therefore not entitled to a qualified immunity defense.

## B. Fourth Amendment Excessive Force (Count I)

Plaintiffs assert against all Officers a claim of excessive force in violation of the Fourth Amendment. The Fourth Amendment prohibits unreasonable searches and seizures. U.S. Const. amend. IV. Whether an officer's use of force in effecting an arrest violates the Fourth Amendment is a question of whether his actions are "'objectively reasonable' in light of the facts and circumstances confronting [him], without regard to [his]

underlying intent or motivation." *Martin v. City of Broadview Heights*, 712

F.3d 951, 958 (6th Cir. 2013) (quoting *Graham v. Connor*, 490 U.S. 386,

388 (1989)). In other words, an officer's subjective beliefs are irrelevant.

*See Est. of Hill by Hill v. Miracle*, 853 F.3d 306, 312 (6th Cir. 2017).

Importantly, the inquiry is not whether *any* force was justified, but

"whether the [officer] 'could reasonably use the *degree* of force'" employed.

*Martin*, 712 F.3d at 958. The Court must assess the reasonableness of a

particular use of force "from the perspective of a reasonable officer on the

scene, rather than with the 20/20 vision of hindsight." *Hicks v. Scott*, 958

F.3d 421, 435 (6th Cir. 2020). It must carefully balance "the nature and

quality of the intrusion on the individual's Fourth Amendment interests

against the countervailing governmental interests at stake." *Martin*, 712

F.3d at 958. And it must bear in mind that police officers routinely face

"tense, uncertain, and rapidly evolving" situations that "force[] split-second

judgments" about the degree of force required. *Hicks*, 958 F.3d at 435

(quoting *Graham*, 490 U.S. at 396-97)).

Against this backdrop, three main factors guide the excessive force

inquiry: "(1) the severity of the crime at issue, (2) whether the suspect

posed an immediate threat to the safety of the officers or others, and (3)

whether the suspect was actively resisting arrest or attempting to evade

arrest by flight." *Id.* (cleaned up). That said, the analysis ultimately boils

down to the totality of the circumstances as would be perceived by a

reasonable officer in the moment. *Goodwin v. City of Painesville*, 781 F.3d

314, 321 (6th Cir. 2015).

An important dividing line exists between active and passive

resistance. *Id.* at 323. Active resistance can be recognized by some

combination of "volatility, hostility, and danger in a way that increases with

the passage of time." *Eldridge v. City of Warren*, 533 F. App'x 529, 535 (6th

Cir. 2013). It requires not only a refusal to comply with orders but also

"some outward manifestation" that suggests intentional disobedience or

blatant resistance, such as refusing to be handcuffed, fleeing from the

police, verbal hostility, or deliberate physical defiance. *Kent v. Oakland*

*Cnty.*, 810 F.3d 384, 392 (6th Cir. 2016). Such active resistance may justify

the degree of force needed to subdue a suspect. *E.g.*, *Laplante v. City of*

*Battle Creek*, 30 F.4th 572, 581 (6th Cir. 2022) (use of takedown); *Kent*,

810 F.3d at 392 (use of taser). Passive resistance, however, will not justify

the same response. *Kent*, 810 F.3d at 392. Passive resistance occurs

when a suspect does not comply with an officer's orders, but the non-

compliance is "not paired with any signs of verbal hostility or physical

resistance." *Eldridge*, 533 F. App'x at 535. Even repeated refusals to

comply will not, by themselves, convert passive into active resistance. *See id.*

    *Use of Force Against Antonieo.* Defendants argue that Roberts' punch to Antonieo was reasonable because Roberts reasonably perceived that Antonieo struck an officer and posed a threat. Defendants rely on Roberts' testimony that he "observed [Antonieo] holding onto an object, possibly a bottle containing liquid, strike [an] officer in his head area with it." ECF No. 43-9, PageID.933; *see also* ECF No. 46-7, 00:25-00:27 (showing a liquid substance falling in front of Roberts immediately before Roberts punches Antonieo). Further, Roberts' bodycam footage shows that just before Roberts punched Antonieo, Roberts found himself in a suddenly aggravated crowd, calling for a split-second judgment. *See* ECF No. 46-7, 00:23-00:29.

    Although plaintiffs do not develop an argument to dispute whether Roberts reasonably perceived that Antonieo struck an officer and posed a threat, the Court nonetheless finds that defendants' version of events conflicts with plaintiffs' version. According to plaintiffs, after Antonieo criticized the police officers' handling of the group of young men, an officer pushed Antonieo, followed by Roberts punching him. ECF No. 43-2, PageID.705, 709; ECF No. 43-1, PageID.664-65; ECF No. 43-4,

PageID.752. Antonieo further testified that after he criticized the police,
Roberts hit him "for no reason." ECF No. 43-2, PageID.709. The evidence
suggests that Antonieo did not strike anyone, consistent with plaintiffs'
theory of their case. *See, e.g.*, *infra* Section IV.C.

Under plaintiff's version of the facts, Roberts' split-second judgment
to punch Antonieo may have been unreasonable. Although Roberts'
bodycam shows a liquid substance falling in front of Roberts just before he
punched Antonieo, the footage also shows that the substance falls *towards*
Antonieo, suggesting it came from another direction. *See* ECF No. 46-7,
00:25-00:27. Moreover, the footage does not show Antonieo make any
sudden movements with his hands or raise a hand to strike an officer in the
head. As a result, a reasonable jury could find it unreasonable for Roberts
to punch Antonieo after seeing a substance fall in Antonieo's direction but
not seeing Antonieo strike an officer or make any movements suggesting
he did so. At the very least, the evidence is not so one-sided that
defendants should prevail as a matter of law. *Payne*, 767 F.3d at 530.
Because there are fact issues as to whether Antonieo struck an officer,
whether Roberts reasonably perceived that Antonieo did so, and ultimately
whether Roberts' punch to Antonieo constituted excessive force, summary

judgment on Antonieo's excessive force claim against Roberts is precluded.

*Use of Force Against Antjuan.* According to defendants, Antjuan admitted to resisting arrest. Defendants assert that Barmore's use of force against Antjuan was reasonable because the use of force was needed to arrest Antjuan and to protect himself and others. Plaintiffs counter that Antjuan did not pose any threat to others or actively resist commands.[4]

As plaintiffs correctly note, defendants cite to no evidence of Antjuan resisting arrest or admitting such resistance at any time before Barmore's use of force. According to Antjuan, he complied with orders to move along the sidewalk, but soon after Steen's horse cut plaintiffs off and pushed Antonieo, he felt somebody punch him and immediately lost consciousness. ECF No. 43-5, PageID.801.

Indeed, no evidence before the Court shows Antjuan posing a threat to others or actively resisting arrest such that Barmore's first use of force—a chokehold takedown—was reasonable. Bodycam footage shows Barmore performing a chokehold takedown on Antjuan from behind while several other officers swarm the two. ECF No. 46-6, 02:14-02:17. It does

---

[4] The parties' arguments do not suggest that the severity of any crime by Antjuan is relevant.

Page **20** of **39**

not show Antjuan's actions leading up to the chokehold takedown. Taking plaintiffs' version of the facts and viewing the evidence in the light most favorable to them, Antjuan was unconscious during Barmore's takedown, and so despite the chaotic situation of several officers swarming Barmore and Antjuan, Barmore would have perceived Antjuan's nonresistance to the officers and the arrest. A reasonable jury, therefore, could find the chokehold takedown constituted excessive force because at no time before the chokehold takedown did Antjuan pose an immediate threat or actively resist arrest such that the chokehold takedown was justified. *See Hicks*, 958 F.3d at 435.

Similarly, no evidence before the Court shows that Antjuan posed a threat or actively resisted arrest such that Barmore's other uses of force—at least four punches—were reasonable. The bodycam footage shows Barmore punching Antjuan at least four times while several officers swarmed Antjuan to arrest him. ECF No. 46-6, 02:17-02:25. According to Antjuan, as he regained consciousness he was lying on his chest while Barmore punched Antjuan's head and back and other officers directed Antjuan to put his hands behind his back. ECF No. 43-5, PageID.803. Alston testified that he could see the officers using force against Antjuan

while on the ground, but Antjuan was not moving. ECF No. 43-1, PageID.665.

Again, taking plaintiffs' version of the facts and viewing the evidence in the light most favorable to them, Barmore should have seen that Antjuan did not pose an immediate threat or actively resisted arrest, as Antjuan was lying on the ground regaining consciousness and piled upon by several other officers. And even if the officers directed him to put his hands behind his back as he regained consciousness and he failed to do so, the evidence shows passive resistance, which would not justify Barmore's punches. *See Kent*, 810 F.3d at 392. Like the chokehold takedown, a reasonable jury could find that Barmore's punches constituted excessive force. *See Hicks*, 958 F.3d at 435. Accordingly, fact issues preclude summary judgment on Antjuan's excessive force claim against Barmore as to both Barmore's chokehold takedown and several punches to Antjuan.

*Use of Force Against Alston.* Alston was subjected to two uses of force: a push from Dodd and a punch from Roberts. As to the push, defendants rely on Dodd's bodycam footage to argue that Dodd's push of Alston was reasonable because Alston ignored verbal commands and ignored being pushed back by Jones. Alston argues that the force was unreasonable because he merely approached Dodd, pleading for badge

numbers and making no threatening gestures. Accordingly, the parties only dispute whether Alston posed a threat.

Based on the record before the Court, a reasonable jury could find that Dodd's use of force against Alston was unreasonable in the circumstances Dodd faced. Undisputed facts show that before Dodd pushed Alston to the ground, Dodd was not in a high stress situation calling for a split-second judgment, *see Hicks*, 958 F.3d at 435. It is undisputed that before Dodd pushed Alston to the ground, Dodd was standing in the street, not engaged in any arrest or the commotion involving plaintiffs and other officers. ECF No. 43-1, PageID.666, 668. Further undisputed is that Alston approached Dodd and asked for badge numbers with open hands and that Dodd then directed Alston to back away. *Id.*

Dodd could clearly see that Alston was not advancing on him or other officers and hear that Alston was asking for badge numbers—Dodd's bodycam footage shows that Alston stopped in front of Dodd a couple feet away and repeatedly asked for badge numbers. ECF No. 46-9. After Alston repeated himself, Dodd grabbed Alston by his shirt, held onto him while pushing him back at least ten feet, and then threw Alston away a similar distance, causing Alston to fall onto the street. *Id.* The footage shows no active resistance from Alston as Dodd pushed him back. *Id.*

Moreover, although Alston may have not complied with Dodd's command to back away, a reasonable jury could find that Alston's noncompliance while asking for badge numbers a couple feet away from Dodd at most constituted passive resistance that did not justify any use of force, such as throwing Alston onto the street. *See Kent*, 810 F.3d at 392. At the very least, there is a factual issue as to whether under these circumstances, Dodd could reasonably perceive Alston to be a threat. *See Hicks*, 958 F.3d at 435. Accordingly, defendants are not entitled to summary judgment on Alston's excessive force claim against Dodd.

As to Roberts' punch, defendants assert that Roberts punched Alston "in direct response to perceived threats from noncompliant [Alston]." ECF No. 43, PageID.634. Defendants do not provide any legal or record citations to support this assertion, nor do they develop their argument. They advert to these issues in a perfunctory manner, thereby waiving their argument as to Alston's excessive force claim against Roberts. *See McPherson*, 125 F.3d at 995-96; *Brenay*, 709 F. App'x at 337. Accordingly, defendants are not entitled to summary judgment on this claim.

*Use of Force Against Jones.* Defendants assert that Steen's horse pushed Jones inadvertently and that Jones suffered no injuries. Defendants do not provide any legal or record citations to support their assertions, nor

do they develop their argument against Jones. Defendants waive their arguments against Jones' excessive force claim and so are not entitled to summary judgment.[5] *See McPherson*, 125 F.3d at 995-96; *Brenay*, 709 F. App'x at 337.

### C. First Amendment Retaliation (Count I)

Plaintiffs next claim retaliation by all Officers in violation of the First Amendment. To establish a prima facie case of First Amendment retaliation, a plaintiff must show "(1) the plaintiff engaged in protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two—that is, the adverse action was motivated at least in part by the plaintiff's protected conduct." *Sowards v. Loudon Cnty.*, 203 F.3d 426, 431 (6th Cir. 2000) (quoting *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc)). Once a plaintiff establishes his prima facie case, "the burden shifts to the defendant to show he would have taken the same

---

[5] In defendants' reply brief, they argue for the first time that defendants' use of force was de minimis and so did not rise to the level of a constitutional violation. ECF No. 47. Because defendants do not make this argument in their opening brief, the argument is waived. *See State Farm Fire & Cas. Co. v. Liberty Ins. Underwriters, Inc.*, 613 F. Supp. 2d 945, 968 (W.D. Mich. 2009) ("Raising an argument for the first time in a reply brief affords the other side no opportunity to respond.").

action even if the plaintiff had not engaged in protected conduct." *Sevy v. Barach*, 815 F. App'x 58, 63 (6th Cir. 2020).

Defendants dispute the third element—the causal connection or retaliatory motive of the officers' challenged acts.[6] They do so largely on grounds that plaintiffs rely on the timing of events to show retaliation. "In theory, temporal proximity between the protected conduct and the adverse action, standing alone, may be significant enough to create an inference of retaliatory motive." *Coleman v. Bowerman*, 474 F. App'x 435, 437 (6th Cir. 2012) (citing *Muhammad v. Close*, 379 F.3d 413, 417-18 (6th Cir. 2004)). But "when other evidence of retaliatory motive is lacking, [courts] have been reluctant to hold that temporal proximity is sufficient to establish causation." *Id.*

*Motive to Retaliate against Antonieo.* To show a lack of retaliatory motive, defendants quote Antonieo's testimony that Roberts "hit me and I fell for no reason." ECF No. 43, PageID.644 (citing ECF No. 43-2, PageID.709). Antonieo then immediately explains that "I said what I speak,

---

[6] Defendants also argue, without development or citation, that plaintiffs fail to plead what protected speech is at issue and the Officers had objectively valid reasons for their challenged actions. These arguments are waived. *See McPherson*, 125 F.3d at 995-96; *Brenay*, 709 F. App'x at 337.

I open my mouth and say what wasn't right, you all shouldn't be hitting on these kids." ECF No. 43-2, PageID.709.

Antonieo's testimony refers to the undisputed fact that he lagged behind the rest of his group to speak out against certain officers for their perceived mishandling of the group of young men. ECF No. 43-1, PageID.664-65 (Alston's corroboration); ECF No. 43-5, PageID.800-01 (Antjuan's corroboration). Antonieo spoke loud enough for those nearby to hear. ECF No. 43-2, PageID.715. And Jones testified that after Antonieo verbalized his concern for the young men, police officers started manhandling him—according to Antonieo, an older officer first shoved him, then Roberts punched him. ECF No. 43-4, PageID.752; ECF No. 43-2, PageID.705.

Taking the evidence in the light most favorable to plaintiffs, the Court finds that the close timing between Antonieo's criticism of the officers and Roberts' punch, and that Antonieo spoke loud enough for Roberts and others nearby to hear his criticism, provide enough circumstantial evidence of Roberts' motive to retaliate against Antonieo for his speech. *See Coleman*, 474 F. App'x at 437. Because the evidence presents a fact issue as to Roberts' motive, summary judgment on Antonieo's claim against Roberts is precluded.

*Motive to Retaliate against Antjuan.* As defendants point out,
Antjuan's testimony indicates that he did not say anything to any officers
before Barmore used force against him. ECF No. 43-5, PageID.802.
Without speech from Antjuan, there can be no motive to retaliate for that
speech. *See Sowards*, 203 F.3d at 431. Plaintiffs, however, argue that
Antjuan's testimony that he did not get a badge number "but an ass kickin"
shows that he asked for an officer's badge number before Barmore's use of
force. ECF No. 43-5, PageID.801.

Even taking the evidence in the light most favorable to plaintiffs, the
record does not show that Antjuan asked for an officer's badge number.
Antjuan testified he got "an ass kickin," after defense counsel's
questioning—about a badge number and other details—that attempted to
identify an officer Antjuan had mentioned in his testimony. *See id.* Because
no evidence shows whether speech from Antjuan could have motivated
Barmore, defendants are entitled to summary judgment on Antjuan's First
Amendment retaliation claim.

*Motive to Retaliate against Alston.* Defendants show the lack of
retaliatory motive against Alston by pointing to Alston's testimony that he
had "no idea" why Roberts punched him. ECF No. 43-1, PageID.666.
Indeed, it is undisputed that with his hands up Alston approached Dodd to

Page **28** of **39**

speak with him; that after listening to Alston until Alston asked for

unspecified officers' badge numbers, Dodd pushed and threw Alston; and

that after Alston stood up, Roberts punched Alston without the two ever

speaking beforehand. *Id.* at PageID.666, 668; ECF No. 46-9. Nothing

shows that Roberts knew about Alston's request for badge numbers.

Although the close timing between Alston's request for badge numbers and

Roberts' punch may suggest a retaliatory motive from Roberts, by itself it

does not. *See Coleman*, 474 F. App'x at 437. Defendants are, therefore,

entitled to summary judgment on Alston's First Amendment retaliation claim

against Roberts.

Defendants, however, offer no argument as to Alston's First

Amendment retaliation claim against Dodd. Defendants do not reference

the interaction between the two, nor provide any citations bearing on the

retaliation issues between the two. Accordingly, defendants are not entitled

to summary judgment on Alston's' First Amendment retaliation claim

against Dodd.

*Motive to Retaliate against Jones.* In arguing against plaintiffs' First

Amendment retaliation claims, Defendants likewise do not mention Jones,

let alone offer a properly support argument about him. Accordingly,

defendants are not entitled to summary judgment on Jones' First Amendment retaliation claim.

### D. Municipal Liability (Count II)

Plaintiffs assert a claim against the City for municipal liability. To hold a municipality liable under § 1983, a plaintiff must show the alleged constitutional violation was due to a municipal policy or custom. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). The plaintiff may show a policy or custom through (1) the municipality's official policies or legislative enactments; (2) the actions of an official with final decision-making authority; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance or acquiescence to federal rights violations. *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005).

Plaintiffs assert the City's liability under the third prong. To succeed on an inadequate training theory, a plaintiff must show: "(1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury." *Howell v. NaphCare, Inc.*, 67 F.4th 302, 319 (6th Cir. 2023) (citing *Ellis ex rel. Pendergrass v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006)).

Defendants argue that due to a lack of relevant discovery, there is no evidence of the City's failure to train. Plaintiffs counter that the City's training was inadequate because the Officers had "a complete lack of training on [their] part in crowd control" and were unfamiliar with Greektown. ECF No. 46, PageID.1239-40.

The record does not support plaintiffs' contention that the City offered no crowd control training. As defendants point out, there is undisputed evidence that the officers did receive training, albeit on the job: Roberts testified that most of his crowd control training comprises "experience from actually encountering large crowds," although the City offered "no official training to deal with large crowds." ECF No. 43-9, PageID.889-90. Steen also testified that certain officers received special training in how to control crowds while riding a horse. ECF No. 43-13, PageID.1117.

Even if the City offered no formal crowd control training and its officers were unfamiliar with Greektown, plaintiffs do not explain how the substance of the City's on-the-job crowd control training was inadequate. *See Howell*, 67 F.4th at 320 ("[F]ailure-to-train liability is concerned with the substance of the training, not the particular instructional format."); *see also Seward v. Antonini*, No. 20-CV-9251, 2023 WL 6387180, at *26 (S.D.N.Y. Sept. 29, 2023) ("[I]nformal [on-the-job] training has been found sufficient

by other courts . . . ." (listing cases)). Because plaintiffs' inadequate training theory fails to show inadequate training, defendants are entitled to summary judgment on plaintiffs' claim against the City for municipal liability. *See Howell*, 67 F.4th at 320 (holding plaintiff's failure-to-train claim failed because "[c]ontrary to the [plaintiff's] argument, the County did not wholly fail to train its officers").

## E. Supervisory Liability (Count V)

Plaintiffs next assert a claim against Barrick for supervisory liability stemming from the alleged excessive force. A § 1983 plaintiff asserting supervisory liability must show "more than an attenuated connection" between his injury and the supervisory officer's alleged wrongful conduct. *Peatross v. City of Memphis*, 818 F.3d 233, 241 (6th Cir. 2016) (citing *Phillips v. Roane Cnty.*, 534 F.3d 531, 544 (6th Cir. 2008)).

"[S]upervisory liability requires some 'active unconstitutional behavior' on the part of the supervisor." *Id.* (quoting *Bass v. Robinson*, 167 F.3d 1041, 1048 (6th Cir. 1999)). This means that the supervisor "either encouraged the specific incident of misconduct or in some other way directly participated in it." *Doe v. Magoffin Cnty. Fiscal Ct.*, 174 F. App'x 962, 970 (6th Cir. 2006). "At a minimum, a § 1983 plaintiff must show that a supervisory official at least implicitly authorized, approved or knowingly

Page **32** of **39**

acquiesced in the unconstitutional conduct of the offending subordinate."
*Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir.1984).

"[A] supervisor cannot be held liable simply because he or she was charged with overseeing a subordinate who violated the constitutional rights of another." *Peatross*, 818 F.3d at 241 (citing *Gregory v. City of Louisville*, 444 F.3d 725, 751 (6th Cir. 2006)). Under § 1983, neither mere negligence nor respondeat superior can be the basis for supervisory liability claims. *See McQueen v. Beecher Cmty, Sch.*, 433 F.3d 460, 470 (6th Cir. 2006).

Defendants argue that Barrick was not aware of the alleged excessive use of force by any of the Officers, let alone adopted it. Plaintiffs counter that Barrick participated in or knew of each Officers' misconduct.

To support their argument, plaintiffs rely on Barrick's testimony that while he was generally supervising his officers escorting a group of men out of Greektown, the group of men became involved in an altercation, which included plaintiffs. ECF No. 43-6, PageID.847. Plaintiffs also rely on bodycam footage that shows Barrick walking with a group of officers

towards Alston as Dodd pushed Alston back and as Roberts punched

Alston.[7] ECF No. 46-11, 01:50-2:05.

Even if the Court assumes that Barrick generally supervised each

Officer for purposes of supervisory liability and specifically observed Dodd's

and Roberts' use of force against Alston, plaintiffs' evidence does not show

that Barrick engaged in any "active unconstitutional behavior." *Peatross*,

818 F.3d at 241. Although the evidence shows Barrick generally directing

other officers, *see, e.g., id.*, 02:09-02:12, 07:20-07:28, nothing suggests

that Barrick specifically encouraged or somehow directly participated in any

uses of force against any plaintiff. Nor does anything show that Barrick

implicitly authorized, approved, or knowingly acquiesced in the uses of

force against plaintiffs. *See Peatross*, 818 F.3d at 243 (holding failure to

train and supervise subordinates to avoid excessive use of force, failure to

investigate their alleged excessive use of force, and attempting to cover up

their excessive use of force showed supervisor's knowing acquiescence).

That Barrick may have observed Dodd or Roberts' uses of force against

---

[7] Plaintiffs also point to various bodycam footage showing that Barrick was among the police officers with Antonieo and Antjuan as Antonieo and Antjuan were injured and not offered aid. However, the Court fails to see the relevance of this evidence—plaintiffs argue for supervisory liability with respect to the alleged excessive force, not with respect to the alleged failure to provide medical care.

Alston, without more, cannot establish a claim for supervisory liability. *See McQueen*, 433 F.3d at 470. Accordingly, defendants are entitled to summary judgment on plaintiffs' claim for supervisory liability.

## F. Failure to Provide Medical Care (Count IV)

Plaintiffs last assert a claim against the Officers for failure to provide medical care.[8] To prevail on a claim for failure to provide medical care, a plaintiff must show that the defendant-officer was deliberately indifferent to the plaintiff's serious medical needs at the time that plaintiff was detained. *Jones v. City of Cincinnati*, 521 F.3d 555, 560 (6th Cir. 2008) (citing *Owensby v. City of Cincinnati*, 414 F.3d 596, 602 (6th Cir. 2005)). "Deliberate indifference requires that the defendants knew of and disregarded a substantial risk of serious harm to [the pretrial detainee's] health and safety." *Owensby*, 414 F.3d at 603.

In one sentence of their opening brief and without citation, defendants argue that the Officers rendered aid or offered to do so immediately

---

[8] Plaintiffs also present an argument purporting to sustain a failure-to-provide-medical-care claim against Barrick. But their complaint does not assert such a claim against Barrick. ECF No. 32, PageID.455, 473-74. Accordingly, the Court disregards that argument.

following any use of force.[9] Plaintiffs counter that the Officers did not render or offer to render any aid. Situating these arguments in the failure-to-provide-medical-care legal framework, the parties argue whether the Officers disregarded any plaintiff's medical needs.

*Disregard of Alston's Needs.* Defendants' brief in support of their motion presented their argument as to whether Roberts disregarded Alston's medical needs in a single sentence, devoid of citation, stating that all Officers rendered aid. The Court considers this argument only because defendants further supported it in their reply brief, in which they cited evidence showing that Roberts propped up and assessed Alston. Plaintiffs' response brief acknowledges that Roberts "propped [Alston] up," but the Court finds that plaintiffs fail to raise a factual dispute as to Roberts' actions. ECF No. 46, PageID.1244.

The record shows that contrary to plaintiffs' argument, Roberts did not disregard Alston's needs. Although Dodd's bodycam footage shows

---

[9] Defendants purport to also argue that (1) nothing shows that plaintiffs had serious medical needs, (2) that some use of force was de minimis and so required no medical care, and (3) there is no evidence that the Officers perceived facts from which to infer plaintiffs' medical needs. But the first and second arguments are conclusory, devoid of citations, and undeveloped; and their second argument appears for the first time in their reply brief. As a result, these arguments are waived. *See McPherson*, 125 F.3d at 995-96; *State Farm*, 613 F. Supp. 2d at 968.

that Roberts' punch knocked out Alston and caused Alston's head to hit the pavement, ECF No. 46-9, Roberts testified that he rendered aid to Alston by propping Alston up after knocking him out, "ma[king] sure [Alston] was responsive and conscious," and visually inspecting Alston for any injuries. ECF No. 43-9, PageID.957-58. According to Roberts, although Alston had a minor cut to his mouth, Alston looked responsive—"he was looking around and still pointing, still yelling. He appeared to be okay." *Id.* at PageID.958. Roberts' testimony shows that he had some regard for Alston's wellbeing and that he attempted to assess and at least mitigate any injuries Alston may have sustained.

Plaintiffs do not dispute Roberts' testimony. Instead, they point to Alston's testimony that after Alston got off the ground, all police officers walked away from him and no officer approached him about medical attention. ECF No. 43-1, PageID.667. Even while taking that evidence in the light most favorable to plaintiffs, general evidence of all officers' actions raises no genuine dispute about whether Roberts' specific actions, including those showing that he had some regard for Alston's wellbeing, amounted to an actual disregard of Alston's medical needs. *See Ownesby*, 414 F.3d at 603. As a result, defendants are entitled to summary judgment on Alston's claim against Roberts for failure to provide medical care.

*Disregard of the Needs of Antonieo, Antjuan, Jones.* To the extent defendants argue for summary judgment on Antonieo, Antjuan, or Jones' claims of failure to provide medical care, such argument is waived. *See McPherson*, 125 F.3d at 995. Defendants' only record citation in their briefing is to Roberts' testimony, which speaks only to Roberts' regard for Alston's medical needs. Moreover, their supporting brief's one-sentence argument fails to develop and support with citations any argument as to whether any officer disregarded the medical needs of Antonieo, Antjuan, and Jones. Their reply brief suffers similar defects. *See McPherson*, 125 F.3d at 995-96; *Brenay*, 709 F. App'x at 337. Because they waive any arguments as to Antonieo, Antjuan, or Jones' claim of failure to provide medical care, they fail to carry their initial burden on summary judgment as to these claims. *See Alexander*, 576 F.3d at 558. On these claims, defendants are not entitled to summary judgment.

## V.     Conclusion

For the reasons above, defendants' motion for summary judgment (ECF No. 43) is **GRANTED IN PART** and **DENIED IN PART**. Defendants' initial motion for summary judgment (ECF No. 42), filed without exhibits, is **TERMINATED**. The Court **DISMISSES** the following claims:

- All plaintiffs' Fourth Amendment unreasonable search and seizure (Count I) and failure to intervene (Count III) claims, as well as their

claims for gross negligence (Count VI) and assault and battery (Count VII);

- Antjuan's First Amendment retaliation claim (Count I) against all Officers;
- Alston's First Amendment retaliation claim (Count I) against Roberts;
- All plaintiffs' municipal liability claims (Count II) against the City;
- All plaintiffs' supervisory liability claims (Count V) against Barrick and Dunbar; and
- Alston's claim for failure to provide medical care against Roberts.

Plaintiffs' remaining claims are as follows:

- All plaintiffs' Fourth Amendment excessive force claims (Count I);
- Antonieo, Antjuan, and Jones's First Amendment retaliation claims (Count II) against all Officers, as well as Alston's First Amendment retaliation claim (Count II) to the extent it is brought against Dodd, Steen, and/or Barmore; and
- Antonieo, Antjuan, and Jones's claims for failure to provide medical care (Count IV) against all Officers, as well as Alston's claim for failure to provide medical care (Count IV) to the extent it is brought against Dodd, Steen, and/or Barmore.

s/ Shalina D. Kumar
SHALINA D. KUMAR

Dated: February 15, 2024            United States District Judge